UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM FARROW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:05CV00797 AGF |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff William Farrow's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income under Title XVI of the Act, id. §§ 1381-1383f. The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is reversed and the case is remanded to the Commissioner for further proceedings.

Plaintiff, who was born on March 3, 1961, filed his application for benefits on February 28, 2003, claiming a disability onset of September 21, 2002, due to residuals of a motor vehicle accident on that date, including seizures; orthopedic injuries; left ulnar nerve injury and pain; and limitations of the left shoulder, left elbow, left hand (claw

deformity), right knee, right leg, and right ankle. Tr. at 16. After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on September 17, 2004, at which Plaintiff was represented by counsel. On January 28, 2005, the ALJ issued a decision finding that Plaintiff was not disabled. The Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision of January 28, 2005, stands as the final agency action.

Plaintiff argues that the ALJ's decision that Plaintiff could perform the sedentary job of an assembler is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ improperly evaluated Plaintiff's residual function capacity ("RFC") and subjective complaints of symptoms; erred in failing to develop the record with regard to Plaintiff's cognitive impairment; and posed a hypothetical question to the vocational expert ("VE") that did not capture Plaintiff's functional limitations.

## BACKGROUND

**Medical Record**

On September 20, 2002, Plaintiff was taken to St. Anthony's emergency room after he was hit by a car as he was crossing the street. Plaintiff was noted to be alert and possibly intoxicated. A toxicology test revealed that Plaintiff's alcohol level was 349. Tr. at 150. On September 21, 2002, orthopedic surgeon, David B. Fagan, M.D., diagnosed a left proximal humerus fracture, left fibula fracture, right tibia fracture, and

right fibula fracture, and performed surgery on all four fractures. Tr. at 207. A tomography exam of Plaintiff's head taken on September 24, 2002, indicated prominent encephalomalacia (soft brain tissue) in the left frontal lobe and less prominently in the right frontal lobe. Tr. at 133-58.

On September 26, 2002, Plaintiff was discharged to a skilled nursing home for physical therapy. Tr. at 106-15. On October 2, 2002, he was seen by Dr. Fagan for evaluation. Plaintiff was using a wheelchair at the time and complained of soreness in his right leg. Dr. Fagan noted that he had very restricted range of motion in this knee, as well as restricted range of motion of his left arm, but that his fracture was well aligned. Dr. Fagan recommended that Plaintiff remain non-weight bearing on his right leg for an additional six to eight weeks, that he work on range of motion of his knee, and that he stop smoking to promote healing. Tr. at 208. On October 2, 2002, Plaintiff was discharged from the nursing facility.

Notes from follow-up evaluations with Dr. Fagan on October 16 and October 24, 2002 indicate that Plaintiff's right leg and left arm fractures were slowly healing, but that he was developing problems with the left wrist and developing a claw deformity in the left hand, and on October 29, 2002, Plaintiff was evaluated by John O'Keefe, M.D., for pain and numbness in the left hand. Examination and testing indicated "reduction in the left ulnar motor conduction velocity across the elbow" and loss of sensation in the left little finger and ring finger. Plaintiff was found to be alert, and all aspects of his mental status were found to be normal. Tr. at 120-26.

Plaintiff returned to Dr. Fagan for a follow-up evaluation of his left arm and right leg on November 11, 2002. Dr. Fagan noted that Plaintiff could work on range of motion of the arm and leg, but based upon Dr. O'Keefe's findings, recommended surgery (anterior nerve transposition of the left ulnar nerve) for his left hand problems. Tr. at 205. With Plaintiff's consent, Dr. Fagan performed this surgery on December 3, 2002, and noted that Plaintiff tolerated the procedure well. Tr. at 131.

Dr. Fagan's treatment notes dated December 5, 2002, indicated that Plaintiff's leg and arm fractures were healing well. Tr. at 204. In a physician's statement dated December 17, 2002, Dr. Fagan reported that Plaintiff was able to stand, sit, and walk intermittently for one hour, but was unable to climb, twist/bend/stoop, reach above shoulder level, operate a motor vehicle, or lift at all. In response to how many hours Plaintiff could work per work, Dr. Fagan wrote zero. Tr. at 202-03. During a follow-up evaluation with Dr. Fagan on January 2, 2003, Plaintiff reported that Plaintiff's left hand was still numb and that he was experiencing a throbbing sensation. On physical examination, Dr. Fagan reported that Plaintiff had a slight varus (abnormal positioning) deformity to his knee, that range of motion in Plaintiff's left shoulder was still fairly restricted, and that Plaintiff's tibia looked good. Tr. at 201. During his next follow-up on January 30, 2003, Plaintiff stated that his left hand did not appear to be getting better. Upon examination, Dr. Fagan noted that Plaintiff's left hand had "significant intrinsic wasting," and that he was developing clawing of his left ring and little fingers. Dr. Fagan found that Plaintiff's range of motion in his left shoulder was greatly improved, that his

4

right knee had good range of motion, but that when he walked, he had a varus (bowlegged) deformity at that knee. Dr. Fagan recommended that Plaintiff continue with his physical therapy routine and weight bear as tolerated. Tr. at 201. At a visit with Dr. Fagan on February 27, 2003, Plaintiff stated that his knee was getting better. However, Dr. Fagan reported that Plaintiff's left ring and little fingers were still clawing, and that the ulnar nerve transposition had not made much progress. Tr. at 200.

On March 17, 2003, a repeat left ulnar nerve transposition was performed by Dr. Susan Mackinnon. On March 27, 2003, Plaintiff reported to Dr. Fagan that the clawing was getting a little worse. Dr. Fagan told Plaintiff that it was relatively soon after the second surgery, and that it might take time for the condition to get better. With regard to Plaintiff's right leg, Dr. Fagan thought that the fracture was healing, and that it would get better and better as time went on and as Plaintiff walked more. Tr. at 199.

On May 2, 2003, Plaintiff was seen by Christine Cheng, M.D., for evaluation of his left hand. Dr. Cheng noted marked ulnar intrinsic muscle wasting, marked ulnar claw deformity, with correctable MP joint hyper extension and fixed PIP joint flexion contractors of the ring and small fingers, decreased sensation in the ulnar nerve distribution, and mildly limited PIP joint motion in the ring and small finger. Plaintiff had negative 60 degrees of extension in each finger. An x-ray revealed marked diffuse osteopenia but no osteoarthritic changes in the left ring and small fingers. Plaintiff complained of paresthesias into various fingers but no significant problems with pain in his left hand. Dr. Cheng noted that although Dr. Mackinnon had referred Plaintiff for

5

therapy, he did not keep the appointment; he did not believe it would be effective and would be too uncomfortable. Upon further discussion with Dr. Cheng, Plaintiff indicated he was interested in surgery to correct his fixed contracture, was willing to undergo extensive therapy (which would include an ulnar claw splint), and understood and agreed to the risks and complications from surgery. Dr. Cheng indicated she would schedule the surgery and refer Plaintiff for hand therapy. Tr. at 213-14.

Plaintiff had left ring and small finger volar PIP joint capsulotomies on May 29, 2003. He missed his post-operative appointment on June 4, 2003, but saw Dr. Cheng on June 11, 2003. Dr. Cheng wrote that Plaintiff had attended hand therapy once, the day after his surgery, but did not have splints fabricated, and that Plaintiff reported he was told no more visits were approved. Physical examination revealed Plaintiff's left fingers were quite stiff, with flexion at both PIP joints of the small and ring fingers decreased. The small finger PIP extension was negative 50 degrees, the ring finger negative 65 degrees. Plaintiff's joints were too fixed for an ulnar claw splint to be useful. Dr. Cheng noted that Plaintiff's deformity had recurred nearly completely, and explained that his outcome was completely dependent on his post-operative therapy. Dr. Cheng issued a new prescription for physical therapy and removed two sutures. Tr. at 212.

Plaintiff saw Dr. Cheng again on June 18, 2003, having attended hand therapy four times in the interim. Plaintiff had not yet received dynamic splints, so his insurance company was called to resolve the delay. Plaintiff's left ring finger had passive PIP joint extension of negative 70 degrees, the small finger negative 40 degrees, and flexion

remained moderately limited. Dr. Cheng told Plaintiff to perform his exercises 10 times daily rather than once or twice, as Plaintiff had been doing, and wrote a new prescription for therapy. Tr. at 211.

On December 19, 2003, Plaintiff saw orthopedist Richard Gelberman, M.D. Dr. Gelberman observed that Plaintiff continued with "contractors of his interphalangeal joints, ring and little fingers, left hand." He also noted that Plaintiff asked for a disability rating, as no active treatment was recommended for his ulnar nerve. Tr. at 210.

On August 14, 2004, Plaintiff was admitted to St. Anthony's emergency room with a diagnosis of new onset seizure. The admitting physician, Bartolome Kairuz, M.D., noted that Plaintiff had apparently been abusing alcohol, and apparently had had some head injury in the past and had been on Dilantin (anti-seizure medication), but had not been taking his medication. Plaintiff's alcohol level was less than 10 and a toxicology screen came back negative for amphetamines, methamphetamine, barbiturates, and cocaine. Following admission, Plaintiff was in the Intensive Care Unit and started on Dilantin. He gradually woke up and improved. MRI findings were "highly suggestive of both recent right internal carotid distribution embolic infarct. Cystic encephalomalacia of left frontal lobe. Area of T2 prolongation suggestive of prior infarct or injury. Another scan showed bifrontal encephalomalacia greater on the left than right, unchanged from 9/4/02." Tr. at 220. Plaintiff did well and was discharged on August 25, 2004, with a diagnosis of alcohol withdrawal convulsive disorder, musculoskeletal pain, and tobacco use, with notes to follow up in two weeks and to continue his medication. Tr. at 218-21.

These latest medical records, from August 2004, were not in the record at the time of the evidentiary hearing held on September 17, 2004.

**<u>Evidentiary Hearing</u>**

Plaintiff, a medical examiner ("ME)," a vocational expert ("VE"), and Plaintiff's brother testified at the evidentiary hearing. Plaintiff testified that he was 43 years old and had a tenth grade education with no additional vocational training. He acknowledged that he had worked as a dishwasher, commercial lawn maintenance worker, factory assembly line worker, and baker. Plaintiff stated that he also had worked as a carpenter for three years, took time off, and worked again as a carpenter for an additional three years. He was confused as to the exact timing of his employment as a carpenter, but believed that it was at least 15 years prior to the hearing. Tr. at 230-31.

Plaintiff stated that after he was struck by the car on September 21, 2002, he did not try to find a job. Plaintiff testified about his August 2004 hospitalization, stating that he was told that he was found in a neighbor's yard "flipping out, tossing and turning." Plaintiff's attorney reported to the ALJ that following the episode, Plaintiff was hospitalized from August 13 through August 25, 2004. Plaintiff testified that he started taking Dilantin after this episode and had not had any seizures since, nor experienced any side effects from the Dilantin. Tr. at 231-34.

Plaintiff testified that he lived with his mother and father, who were 76 and 75 years old, respectively. He stated that he did not drive, and no longer cooked because he could not cut food due to his left-hand deformity. He testified that he would go to the

8

store with his mother, but was unable to lift anything with his left hand. He testified that he wrote with his right hand and threw with his left hand, and that his ability to lift with his right hand was unrestricted. Plaintiff stated that he was able to stand for 20 to 30 minutes and could walk for approximately 30 minutes. He stated that he did "nothing" during the day, was bored by television, and spent his days sitting on his porch. Tr. at 234-37.

Plaintiff claimed that following the accident, his most recent employer, the bakery, was not willing to provide him with a position, even in the wrapping department. He attributed this to the condition of his left hand, and stated that he himself did not think he could handle such a job. The ALJ observed that Plaintiff's last two fingers on his left hand were bent over and Plaintiff stated that they were always like that. When asked if he could bend his middle finger and index finger, Plaintiff stated, "Part. I can force this one," and the ALJ asked, "The index?" Plaintiff stated that he could touch his left index finger to his left thumb without much difficulty, but that he could not pick up a pen or a coin with his left hand. Plaintiff further stated that he was unable to make a complete fist of his left hand and that he experienced pain in that hand "all the time." He described the pain as similar to needles going through his hand extending up to his elbow. Tr. at 237-40.

Plaintiff recalled that he was once hospitalized after he had been mugged, but he could not recall when that was. He was unable to recall any of the details of the mugging, other than that he was sure he was hit in the head. He also recalled that he was

in a nursing home following that hospitalization. Plaintiff also remembered parts of his hospitalization in August 2004, but not how he got to the hospital. He testified that his parents needed help around the house, but that he did not help them, rather his brother did. Plaintiff stated that he had difficulty dressing and was unable to tie his shoes because he was limited to the use of his right hand. Upon further questioning about his left-hand problem, Plaintiff stated that he had sensation only in his thumb and index finger, though he felt constant pain in the other three fingers, "like needles going in them." Tr. at 240-43.

The ME, who was not present at the hearing, testified by telephone that except for Plaintiff's left wrist and hand, no data existed regarding his other injuries from the September 21, 2002 car accident, beyond a period of six months following the incident. Accordingly, the ME stated that these other injuries (left shoulder and right leg, knee, and ankle) did not result in an impairment lasting 12 months or more. Tr. at 245-46.

The ME opined that Plaintiff's most significant problem was his left hand and wrist. The ME testified that Plaintiff had suffered bone loss and loss of muscle mass in his left hand, and that Plaintiff had an irreparable problem with the left ulnar nerve, "with severe joint contractions." Based upon the medical records, the ME opined that the flexion of the interphalangeal of Plaintiff's left ring finger was 70 degrees short of full extension, while the left little finger was 40 degrees short of full extension. Tr. at 248-49.

The ME opined that Plaintiff could not do any work with his left hand, but could

do fine fingering with his left thumb and index finger.  The ME stated that the strength of Plaintiff's thumb, index, and middle fingers was "probably pretty well preserved," but that Plaintiff did not have much strength in his fourth and fifth fingers.  The ME stated that "because of the weakness of the muscles, however, intrinsic muscles, I would limit him to doing nothing other than maybe picking up stuff – a pencil.  He's able to write with the left hand if he does use that – I understand he's ambidextrous. . . ."  Tr. at 249.

Upon questioning by Plaintiff's attorney, the ME testified that Plaintiff would not be able to grip things very well with his left hand.  Plaintiff's attorney told the ME that Plaintiff had shown the ALJ that he could not bend his left middle finger as far as he could bend the left index finger; counsel asked if that would cut down on Plaintiff's ability to write with his left hand.  The ME stated that he could not see Plaintiff and how he functioned with regard to his left middle finger, but that there was no information about the middle finger in the record, and that he could possibly write with that hand.  Tr. at 51-52.

The VE began his testimony by seeking clarification of whether or not Plaintiff's work as a carpenter was recent enough to be considered in the VE's evaluation of transferrable skills.  The VE testified that if Plaintiff's employment as a carpenter were within the past 15 years (and hence part of Plaintiff's relevant work history), Plaintiff would possess inspecting and measuring skills which would transfer to the sedentary positions of inspector or tester.  Tr. at 256.

The ALJ asked the VE to consider an individual with Plaintiff's vocational factors

(age, education, and work experience) who had the following abilities: limited to sedentary work, ambidextrous, and able to do fine fingering with his left thumb and index finger, but no gross manipulation with the left hand. The VE stated that there would be approximately 8,000 inspection jobs and 15,000 assembler jobs in the region. Upon further questioning, the VE testified that with the added limitation of only being able to perform simple, repetitive tasks, the individual would be able to work as an assembler of which 2,000 suitable positions existed regionally. Tr. at 256-58.

Upon questioning by Plaintiff's attorney, the VE explained that the sedentary assembly jobs he was talking about would require both hands to do the assembly, and that "we're talking about small parts assembly, which would require fine finger manipulation and limited -- not so much gross manipulation, and in this case the individual, according to the hypothetical has the use of both hands for fine manipulation and the semi-dominant right for gross manipulation." Tr. at 259. The VE testified that if the individual had full use of his right hand but could only use the left index finger and thumb, the assembly jobs available would be reduced by half the number he previously posited. Plaintiff's attorney asked the VE to consider the added limitation of an individual who could not do dishes because he could not hold plates, or could not tie his own shoes. The VE testified that there would not be any assembly jobs in the economy for such an individual, but there would be inspecting and testing positions. Tr. at 259-60.

Darrell Farrow, Plaintiff's older brother, testified that he typically saw Plaintiff on a daily basis. He testified that he checked on his parents and Plaintiff, who he said got

lonesome and had "problems with his head." Darrell Farrow testified that Plaintiff had difficulty remembering, and that this difficulty started following Plaintiff's hospitalization after a mugging and beating four or five years prior to the hearing. He testified that Plaintiff was injured in the back of the head and initially was not expected to survive the attack and that since the beating, Plaintiff was much less active and Plaintiff's relationship with Plaintiff's daughter deteriorated. Tr. at 261-63.

When questioned about Plaintiff's difficulty with sitting and standing, Darrell Farrow recounted the September 2002 car accident, stating that Plaintiff went through the windshield and again was not expected to survive. Darrell Farrow stated that since his head injury, Plaintiff's behavior was odd – for example, he would wear a winter coat throughout the summer, even in 100 degrees weather. When asked about the timing of Plaintiff's employment as a carpenter, Darrell Farrow stated that he believed it had occurred approximately ten years ago and lasted four to five years. Darrell Farrow testified that he and Plaintiff had planned to start a landscaping business together, but that Plaintiff's mental limitations since the mugging prevented them from doing so. Tr. at 264-68. Plaintiff's attorney requested a consultative mental exam of Plaintiff, given the lack of medical documentation about his head injuries, and the ALJ stated that he would consider the request. Tr. at 268-69.

**ALJ's Decision**

The ALJ first determined that Plaintiff had not engaged in substantial gainful employment since his alleged disability onset date of September 21, 2002. The ALJ then

found that Plaintiff's impairments were severe but did not, individually or in combination, meet or equal the criteria set forth for a disabling impairment listed in the Commissioner's regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ recounted the ME's testimony regarding the lack of recent data regarding Plaintiff's left shoulder, right leg, or right knee injuries, which prevented findings of disability based upon those injuries. The ALJ stated that the ME opined that Plaintiff remained capable of performing fine fingering with the left hand, as the thumb, index finger and middle finger of that hand were not impaired to the extent that would preclude fine fingering with that hand. The ALJ concluded that the record supported this opinion. Tr. at 17.

The ALJ also stated that "there is no evidence in the record to indicate any type of mental impairment or neurological cognitive abnormality." Tr. At 19. The ALJ mentioned the testimony of Plaintiff's brother that Plaintiff had difficulty thinking "since his accident" and that his memory was diminished, but the ALJ stated that he gave "greater weight to longitudinal objective medical evidence of record and to the opinion of [the ME]." Tr. at 21. The ALJ stated that he considered Plaintiff's allegations of the nature, severity, and functionally limiting effects and symptoms pursuant to Social Security Rulings ("SSR") 96-3p, 96-4p, 96-7p, and pertinent regulations, and rejected those allegations for nine reasons: Plaintiff's testimony that he took his medication as prescribed, was helped by it, and suffered no adverse side effects; that with the exception of a doctor's visit in December 2003 and hospitalization after an alcohol withdrawal

14

seizure in August 2004, all of Plaintiff's treatment occurred within nine months of his car accident, with Plaintiff's claw deformity of his left hand the only significant residual effect; the ME's testimony that Plaintiff exhibited no difficulties with fine fingering; no physician of record found, for a continuous period of at least 12 months, any greater limitations than found by the ALJ; the lack of evidence that Plaintiff experienced seizures prior to the incident in August 2004, which was related to noncompliance with medication and alcohol abuse, and the normal results of Plaintiff's examination at that time; the fact that Plaintiff has not undergone mental health treatment, and that no mental health abnormalities were present in the record; that by May 2003, Plaintiff's major complaint was paresthesias of his fingers, and "following his final hand surgery he had no significant complaints"; Plaintiff has reportedly been noncompliant with prescribed treatment on multiple occasions; and that on Plaintiff's December 19, 2003 visit with Dr. Gelberman, no active treatment was recommended for Plaintiff's impairments. Tr. at 21.

The ALJ found that Plaintiff had the RFC to perform sedentary work, limited to simple repetitive tasks, with seizure precaution, such as no work at unprotected heights or involving dangerous machinery, and limited to fine fingering but no gross manipulation with the left hand. The ALJ stated that in so doing he gave the claimant some benefit of the doubt as to the severity of his impairments. The ALJ found that Plaintiff was unable to perform his past work, but that based upon the testimony of the VE, Plaintiff was capable of performing the job of assembler, and therefore, was not disabled. The ALJ denied Plaintiff's request for a psychiatric exam, stating that but for Plaintiff's abuse of

alcohol, there was no mention of any mental problems in the record nor any referral for any type of mental evaluation. Tr. at 21-22.

## **STANDARD OF REVIEW AND STATUTORY FRAMEWORK**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be

expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

17

Where a claimant cannot perform the full range of work in a particular category of work defined at 20 C.F.R. § 404.1567 (very heavy, heavy, medium, light, and sedentary) due to nonexertional impairments, such as pain or intellectual functioning, the Commissioner must present testimony by a VE to meet her burden at step five. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006). The response of a VE to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five. Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).

## **DISCUSSION**

Here the ALJ decided at step five that, based upon the VE's testimony, Plaintiff could perform the job of assembler. It seems clear to the Court that the ALJ erred in this conclusion. Any fair reading of the ME's testimony of Plaintiff's left-hand impairment and the VE's testimony must lead to the conclusion that Plaintiff could not perform the job of a small parts assembler. The ME's statement that Plaintiff could do fine fingering with his left thumb and index finger cannot be isolated from his general testimony about Plaintiff's left-hand impairment. This testimony included the ME's elaboration that he would limit Plaintiff to doing nothing other than maybe picking up something like a pencil with his left hand, and that Plaintiff would not be able to grip things very well with that hand. Tr. at 249. Plaintiff's left-hand capabilities were not sufficiently reflected in the hypothetical question that the ALJ posed to the VE. Accordingly, the decision of the Commissioner is not supported by substantial evidence in the record, and must be

18

reversed and remanded. See, e.g., Swope v. Barnhart, 436 F.3d 1023, 1025 (8th Cir. 2006) (it is critical at step five "for ALJs to pose thorough and complete hypothetical questions to vocational experts"; case reversed and remanded where that was not done); Grissom v. Barnhart, 416 F.3d 834, 837-38 (8th Cir. 2005) (same).

On remand, the Commissioner might decide that as Plaintiff cannot perform the sedentary job of assembler, he is disabled. Alternatively, the Commissioner might obtain new testimony from a VE as to whether there are other available jobs Plaintiff might be able to perform, based upon a complete and thorough hypothetical question. The Court believes that in order to present such a question, the record must be further developed with regard to Plaintiff's cognitive abilities. If upon remand, the Commissioner determines that Plaintiff is not limited to sedentary work, this finding would require further development of the record, such as recontacting Plaintiff's treating orthopedist or obtaining a new consultative examination.

## **CONCLUSION**

The ALJ's decision that Plaintiff is not disabled is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 29th day of September, 2006.